**David POWELL, Plaintiff–Appellant,**

v.

**Daniel P. GARDNER, Badge No. 2879, individually and as a police officer of the Suffolk County, New York Police Department; "John Doe", individually and as a police officer of the Suffolk County, New York Police Department; "Norman Noe", individually and as a police officer of the Suffolk County, New York Police Department; "Richard Roe", individually and as a police officer of the Suffolk County, New York Police Department and County of Suffolk, Defendants–Appellees.**

**No. 130, Docket 89–7183.**

United States Court of Appeals, Second Circuit.

Argued Sept. 19, 1989.

Decided Dec. 13, 1989.

Arthur V. Graseck, Jr., Port Washington, N.Y., for plaintiff-appellant.

Charles P. Kelly, Asst. County Atty., Hauppauge, N.Y. (E. Thomas Boyle, Suffolk County Atty., Dennis E. Milton, Chief Deputy County Atty., Frederick Eisenbud, Asst. County Atty., Hauppauge, N.Y., on the brief), for defendants-appellees.

Before VAN GRAAFEILAND, MESKILL, and KEARSE, Circuit Judges.

KEARSE, Circuit Judge:

Plaintiff David Powell appeals from a final judgment of the United States District Court for the Eastern District of New York, Mark A. Costantino, *Judge*, dismissing (a) his claims under 42 U.S.C. § 1983 against defendants Daniel Gardner and the County of Suffolk ("County") for use of excessive force in connection with an arrest, in violation of his rights under the Constitution, and (b) his pendent state-law claims, following directed verdicts in favor of defendants at trial. On appeal, Powell contends principally that the district court erred in ruling that Powell had not made out a prima facie case on his federal claims. Finding merit in the contention that the proof established a prima facie case against Gardner, we vacate so much of the judgment as dismissed the claims against him and remand for trial of those claims. We modify and affirm so much of the judgment as directed a verdict dismissing Powell's claims against the County.

## I. BACKGROUND

The present lawsuit arises out of events that occurred in connection with the arrest of Powell by Gardner, a County police officer, on September 3, 1985. Powell alleged that after he was arrested and had been taken to the police station, Gardner and several other officers assaulted and beat him, in violation of his rights under the Fourth, Fifth, Eighth, and Fourteenth Amendments to the Constitution and various state laws. He sued Gardner as a participant in the assault and asserted that the County was liable for authorizing and tolerating such conduct as an institutional practice. The evidence at trial, viewed in the light most favorable to Powell, showed the following.

After cashing a check early in the day for $442.00, Powell met a friend, and the two drank beers at a local bar until 1:00 p.m. They then bought a bottle of gin and continued their drinking throughout the afternoon. By early evening, Powell was drunk.

At 7:30 p.m., Gardner arrested Powell pursuant to a court-issued warrant. He patted Powell down and took him to the police station. At the station, Powell was logged in by Officer Robert O'Kane, the desk sergeant. O'Kane noted in the log that Powell was drunk and that he had an ace bandage on his right wrist resulting from a sprain some two months earlier.

After the logging-in was complete, Gardner took Powell to a squad room for processing and handcuffed him to a desk. Gardner left the squad room to inquire about the amount of Powell's bail; on his return, he informed Powell that bail had been set at $200.00. When Powell searched his pockets for money, he found only $10.00. He accused Gardner of hav-

ing taken his money, claiming that he had had $350.00 when he was arrested. Powell lodged a complaint with a police lieutenant about the missing money.

Powell testified that after he made his formal complaint, Gardner and three other officers took him to another room and beat him:

A: ... And then [Gardner] put the cuffs on me. Come on, you are going in the back.

I got up, handcuffed, and we got to the strip search area. I saw guys there in uniform....

....

Q: What happened after the [sic] saw the three men—was this in addition to Officer Gardner?

A: Yes. He took off one of the cuffs and slammed me to the ground and they all started jumping on me and twisting my arm and punching me ripping my clothes off....

....

Q: Was this physical encounter preceded by any words being spoken?

A: I had been telling them I was annoyed he took my money.

Q: What, if anything, was said about your sweater?

A: I didn't get a chance to take it off, he ripped it off.

Q: Did anyone say anything to you about your sweater?

A: No. We will get these clothes off. He is being hostile, he is resisting. I didn't try to resist, I didn't get a chance to. I wouldn't have tried to anyway, four guys.

Q: What was your physical condition when you arrived at that lock up area?

A: Except for the sprained wrist which wasn't bothering me, I was drunk.

Q: Can you describe any further this physical encounter?

A: After they ripped my clothes they dragged me into the cell and somebody was spitting on me and slammed the door on me.

I was moaning, they knew I was hurt. I was suffering. I was scared too. I didn't want to say nothing.

Q: What injuries—what pain if any did you experience?

A: I was hurting all over, wrist, elbow, ribs, back, my legs. My behind.

Afraid to complain, Powell remained in his cell until the following morning, when he lodged a complaint, gave a statement, was photographed, and finally was taken to a hospital. He was treated by emergency room physicians for a broken right wrist, necessitating placement of that wrist in a cast, numerous abrasions, and an injured left elbow necessitating placement of his left arm in a sling. Hospital records supported his claims of injury. Powell testified that his right arm remained in a cast for approximately six weeks and that he suffered from recurring nightmares about being beaten up.

After the close of Powell's case, Gardner and the County moved for a directed verdict, stating, in pertinent part, as follows:

MR. KELLY [Attorney for defendants]: As to Suffolk County, there has been no evidence whatsoever put into evidence as a policy or practice of any kind whatsoever. The ones called either had no information to offer or deny that any such policy or practice existed. There is absolutely no hint of any policy or practice of any kind by Suffolk County. As to the pending [sic] claim against Suffolk County, we believe, defendants believe that they should not be retained once the federal claims are dismissed.

....

As to Officer Gardner, we do not believe that any reasonable injury could— that plaintiff has proved its [sic] case by a preponderance of the evidence. We believe that the existing standard in this circuit and throughout the country. [Sic.] And accordingly, we move based on the testimony that before the Court, that the case be dismissed based on direct verdict under Rule 50 of the federal rules.

After Powell's attorney argued that the motions should be denied because the court

was required to view the evidence in the light most favorable to the plaintiff, the court granted the motions as to both defendants:

THE COURT: The Court has listened to the argument of both attorneys, and this is unusual to make this kind of a determination. I do find the preponderannce [*sic*] of the proof in this case, the notice of claim, this court will direct a verdict in favor of the county and in favor of the officer; that's it.

Judgment was entered dismissing all of Powell's claims, stating that "there is no evidence upon which a jury could properly find a verdict for the plaintiff." This appeal followed.

## II. DISCUSSION

On appeal, Powell contends principally that the court erred in directing a verdict in favor of defendants because, taken in the light most favorable to Powell, the evidence was sufficient to permit the jury to find in his favor. He also complains that the court denied him a fair opportunity to present his case by curtailing his examination of certain witnesses, quashing certain subpoenas, and forcing him to rest his case prematurely. We find merit in the contention that the court improperly directed a verdict in favor of Gardner. As to the County, we conclude that the court properly directed a verdict dismissing the § 1983 claim and that the state-law claims against the County should be dismissed for lack of jurisdiction.

### A. *The Evidence Against Gardner*

■ The trial judge may grant a directed verdict only if, viewing the evidence in the light most favorable to the nonmoving party, " '(1) there is a complete absence of probative evidence to support a verdict for the non-movant or (2) the evidence is so strongly and overwhelmingly in favor of the movant that reasonable and fair minded men in the exercise of impartial judgment could not arrive at a verdict against him.'" *Mattivi v. South African Marine Corp., "Huguenot",* 618 F.2d 163, 167 & n. 3 (2d Cir.1980) (quoting *Armstrong v. Commerce Tankers Corp.,* 423 F.2d 957, 959 (2d Cir.), *cert. denied,* 400 U.S. 833, 91 S.Ct. 67, 27 L.Ed.2d 65 (1970)). "A directed verdict is proper only if 'the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable men could have reached.'" *Fiacco v. City of Rensselaer,* 783 F.2d 319, 329 (2d Cir.1986) (quoting *Simblest v. Maynard,* 427 F.2d 1, 4 (2d Cir.1970)), *cert. denied,* 480 U.S. 922, 107 S.Ct. 1384, 94 L.Ed.2d 698 (1987).

The same framework applies to our review of a directed verdict. *See, e.g., Konik v. Champlain Valley Physicians Hospital Medical Center,* 733 F.2d 1007, 1013 (2d Cir.), *cert. denied,* 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984). If, drawing all reasonable inferences in favor of the nonmoving party and making all credibility assessments in his favor, there is sufficient evidence to permit a rational juror to find in his favor, we must overturn the directed verdict.

We apply these principles in the context of the substantive standard that governs Gardner's conduct. The Supreme Court has not made it entirely clear whether that standard is the purely objective reasonableness test set forth in *Graham v. Connor,* — U.S. —, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), or the partially subjective test used in *Johnson v. Glick,* 481 F.2d 1028 (2d Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973). In *Graham v. Connor,* the Supreme Court ruled that the objective reasonableness standard normally applicable to claims of Fourth Amendment violations is the appropriate test for *"all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen." 109 S.Ct. at 1871 (emphasis in original). The Court held that this objective test was to be applied to the claims of a plaintiff who had been stopped, handcuffed, and detained for some period; while detained he had his head slammed against a car and suffered

various other injuries, including a broken foot.

The *Graham* Court declined to decide "whether the Fourth Amendment continues to provide individuals with protection against the deliberate use of excessive physical force beyond the point at which arrest ends and pretrial detention begins." *Id.* 109 S.Ct. at 1871 n. 10. In *Calamia v. City of New York*, 879 F.2d 1025, 1034–35 (2d Cir.1989), we ruled that *Graham* required use of the objective Fourth Amendment standard to the claim of a plaintiff who complained that after his arrest he had been forced to remain on the floor of his home, with his hands handcuffed tightly behind his back for six hours while six policemen collected property covered by a search warrant. We think the Fourth Amendment standard probably should be applied at least to the period prior to the time when the person arrested is arraigned or formally charged, and remains in the custody (sole or joint) of the arresting officer.

Under the *Graham v. Connor* test, we think it clear that the district court erred in directing a verdict in favor of Gardner. Under this standard, the jury would be instructed that it could find in favor of Powell if it believed his testimony and it were persuaded that the conduct of Gardner was not objectively reasonable in light of the facts and circumstances confronting him. Gardner's argument to this Court that there was insufficient evidence to establish that he personally assaulted Powell is entirely frivolous. Powell testified that it was Gardner who slammed him to the ground and that "all" of the officers jumped on him, punching him and twisting his arm. Though Gardner and another police officer gave versions of the events that differed from Powell's, the matter of whose version to believe was within the province of the jury, not of the court. If the jury found Powell's testimony credible and took into account the fact that the claimed assault took place in a police station and that Powell emerged from this encounter with one arm in a cast and the other in a sling, and if it believed, as it was entitled to, Powell's testimony that he had made no effort to resist, it could easily conclude that Gardner's use of force against Powell was not objectively reasonable.

Even if the *Johnson v. Glick* substantive due process test were applicable, we could only conclude that the evidence adduced by Powell sufficed to withstand a motion for a directed verdict in favor of Gardner. That test requires inquiry into both subjective and objective factors, such "as the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." 481 F.2d at 1033. Powell's testimony as a whole, and the fact that Powell had formally accused Gardner of taking several hundred dollars from him during his arrest, provided an ample basis on which a jury could infer that Powell was beaten unnecessarily, maliciously, and for the purpose of causing him harm.

The trial court, in directing a verdict in favor of Gardner, stated that it viewed the preponderance of the evidence as favoring him. It thus improperly ruled on the basis of its own assessment of the weight of the evidence, rather than viewing the evidence in the light most favorable to Powell.

Finally, we note that defendants have argued that Powell's claims were dismissable because he failed to file with the County a notice of claim within 90 days after his claims arose as required by N.Y.Gen. Mun.Law § 50–e (McKinney 1986 & Supp. 1989). This contention is foreclosed by the pleadings since the answer admitted that Powell had served the notice of claim attached to his complaint; that notice bore the County's date-stamp showing that the County received it on the 90th day after the events complained of.

In light of the foregoing, we vacate the judgment dismissing Powell's § 1983 and pendent state-law claims against Gardner and remand to the district court for trial of those claims.

**B.** *The Directed Verdict in Favor of the County*

In contrast, we conclude that, though the court similarly stated that the preponderance of the evidence favored the County, a directed verdict in favor of the County on Powell's claim under § 1983 was proper. We reach this conclusion because the record is devoid of evidence from which the jury could have found that Powell was injured as the result of a municipal custom or policy, and because we are unpersuaded that Powell was unfairly denied the opportunity to present such evidence.

**1.** *Sufficiency of the Evidence on the § 1983 Claim*

It is well established that a municipality may not be held liable solely on the basis of *respondeat superior*. *See Monell v. Department of Social Services*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978). In order to establish the liability of a municipality in an action under § 1983 for unconstitutional acts by its employees, a plaintiff must show that the violation of his constitutional rights resulted from a municipal custom or policy. *See, e.g., Pembaur v. City of Cincinnati*, 475 U.S. 469, 478–79, 106 S.Ct. 1292, 1297–98, 89 L.Ed.2d 452 (1986); *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 818, 105 S.Ct. 2427, 2433, 85 L.Ed.2d 791 (1985); *Monell v. Department of Social Services*, 436 U.S. at 690, 694, 98 S.Ct. at 2035, 2037; *Fiacco v. City of Rensselaer*, 783 F.2d at 326; *Vippolis v. Village of Haverstraw*, 768 F.2d 40, 44 (2d Cir.1985), *cert. denied*, 480 U.S. 916, 107 S.Ct. 1369, 94 L.Ed.2d 685 (1987). This does not mean that the plaintiff must show that the municipality had an explicitly stated rule or regulation. *Villante v. Department of Corrections*, 786 F.2d 516, 519 (2d Cir.1986). The inference that a policy existed may be drawn from circumstantial proof, such as evidence that the municipality customarily failed to train its employees and displayed a deliberate indifference to the constitutional rights of those within its borders, *see, e.g., City of Canton v. Harris*, —— U.S. ——, 109 S.Ct. 1197, 1206, 103 L.Ed.2d 412 (1989), or evidence that the municipality repeatedly failed to make any meaningful investigation into charges that police officers had used excessive force in violation of the complainants' civil rights, *see, e.g., Fiacco v. City of Rensselaer*, 783 F.2d at 328. The single incident alleged in a complaint, however, especially if it involved only actors below the policy-making level, generally will not suffice to raise an inference of the existence of a custom or policy. *Id.*

In his complaint, Powell had alleged, *inter alia*, that it was the County's custom to fail to discipline police officers "known to be irresponsible in their dealings with citizens of the community," retaining such officers in their positions and failing to forward criminal complaints against them to the County Attorney's office. Powell has not, however, pointed us to any such evidence in the trial record. His contention that the County should be held liable on the basis of *respondeat superior* and his reliance on its dealing with the incident at issue here are contrary to established law. The only other evidence to which he points is the testimony of police captain Howard Mandell, which appears to concede that at some point in time Mandell became concerned that assaults by police officers might be covered up by the police department and so testified before a County legislative committee. Powell's counsel did not, however, question Mandell as to the timing of his concern, or the timing of any such assaults, or even the timing of his testimony. Mandell's testimony, vague in the extreme, was entirely insufficient to establish a County policy of condonation or indifference.

**2.** *Powell's Procedural Challenges*

Powell contends that the district court made a number of procedural errors that denied him an adequate opportunity to prove the existence of the requisite municipal policy. He complains that the court refused to enforce certain of his subpoenas, curtailed his examination of certain witnesses, and forced him to rest his case before he had completed the presentation of his evidence. We find no merit in these

contentions, which do not warrant extended discussion.

 For example, Powell contends that the court erred in quashing a subpoena against a former County attorney, Chris P. Termini; he argues that Termini's testimony would have supported his contention that the County's procedures for investigating claims against police officers were deliberately flawed. Termini, however, ceased to be a County attorney in June 1984; though he was a consultant to the County until December 1984, he was not in a position to give first-hand testimony as to the policies and practices of the County in September 1985 when Powell was injured. It was not an abuse of the court's discretion to quash the subpoena against him. Similarly, it was not an abuse of discretion for the court to sustain objections to Powell's questioning of police inspector William D. Okula as to the County's investigative practices in 1985. Okula testified that he was not in the investigative unit at that time and had no first hand knowledge of those practices at the times pursued in the questioning.

 Nor do we see an abuse of discretion in the court's refusal to grant Powell's request that the County be ordered to disclose the names and addresses of prisoners who had been granted youthful offender status. A policy of sealing such records has a clear societal benefit, and we see no indication that Powell showed that his interest in conducting a broad-scale fishing expedition outweighed the substantial interests in maintaining the confidentiality of those records.

 Finally, we reject Powell's challenge to the trial court's refusal to allow him time to call additional witnesses, leading Powell to rest his case. Powell's requests were hardly compelling. On the third day of trial, his attorney Arthur Graseck informed the court that he had no further evidence at that time:

> MR. GRASECK: We have nothing further at this time, your Honor.
>
> THE COURT: Plaintiff rests?
>
> MR. GRASECK: Well—

> THE COURT: If you have nothing further, you either rest or you have something further.
>
> MR. GRASECK: It's up to the Court.

The court properly rejected the notion that it was for the court to decide whether Powell wished to call additional witnesses. After a short recess, Graseck announced that he wished to call "a couple of additional witnesses; Officer Donnelly and more [*sic:* Moore]." Aside from indicating that these two men had signed a certain document, Graseck's description of the testimony to be elicited from them was vague. The County stipulated to the admission of the document, and the court stated that Powell could call these witnesses if they could be brought in that day. Powell had not, however, subpoenaed them for that day.

Though Graseck then stated that there were additional witnesses he wished to call, the only ones he identified were Powell and his wife. But the wife was not present; Graseck did not know how long it would take her to get to court, and indeed he was not even sure whether she would come. In any event, there was no indication that either could give any testimony relating to the existence of a County custom or policy. It was hardly an abuse of the trial court's discretion to decline to delay the trial to allow Powell to call his last-minute witnesses, the value of whose testimony was entirely speculative, or to recall Powell on a subject that could have been covered in his initial testimony.

In sum, we find no merit in any of Powell's contentions that he was denied an adequate opportunity to establish the existence of the requisite policy. We therefore affirm so much of the district court's judgment as dismissed the § 1983 claim against the County.

### 3. The State–Law Claims Against the County

 Proof of a municipal custom or policy was not a prerequisite to Powell's recovery against the County under state law. Thus, the dismissal of the state-law claims cannot be sustained on the basis discussed

in Part II.B.1. above, and no other basis for a decision on their merits was asserted by the County. Rather, the County's motion for a directed verdict asked simply that those claims "not be retained once the federal claims are dismissed." We agree that, in light of the proper dismissal of the § 1983 claim against the County, the district court should have declined to exercise pendent jurisdiction over Powell's state-law claims against the County. *See, e.g., United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

## CONCLUSION

We have considered all of Powell's contentions on this appeal and, except as indicated above, have found them to be without merit. The judgment is affirmed to the extent that it dismissed the § 1983 claim against the County; to the extent that the judgment dismissed the state-law claims against the County, we direct that it be modified to state that those claims are dismissed for lack of jurisdiction. To the extent that the judgment dismissed the § 1983 and pendent state-law claims against Gardner, it is vacated, and the matter is remanded for further proceedings not inconsistent with this opinion.

Costs are awarded to the County against Powell, and to Powell against Gardner.